IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

AMA B. EDUSEI                          :

                                    :

    v.                 :   Civil Action No. DKC 13-0157

                                    :

ADVENTIST HEALTHCARE, INC.             :

                                    :

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this medical leave case is the motion for summary judgment filed by Defendant Adventist HealthCare, Inc. (ECF No. 28). The issues have been fully briefed, and the court now rules, no hearing being deemed necessary. Local Rule 105.6. For the following reasons, the motion for summary judgment will be denied.

**I.   Factual Background[1]**

Plaintiff Ama B. Edusei worked as an echocardiogram technician for Defendant in the cardiology unit of Washington Adventist Hospital ("WAH") in Takoma Park, Maryland. The unit typically had three technicians working at once, but could get by with only two. Having fewer than two technicians working put patients in danger should an emergency arise.

---

[1] Unless otherwise noted, the facts outlined here are construed in the light most favorable to Plaintiff, the nonmoving party.

Plaintiff's father was ill and living in Ghana. She desired to visit her father and, in March 2010, put in a leave request for December 12, 2010 through January 30, 2011. Her supervisor – Adella Lowe-Brooks – denied the request, stating that four weeks was the maximum leave allowed per policy. She was instructed to apply for four weeks of leave or for an unpaid leave of absence. (ECF No. 34-5). Plaintiff asked what would happen if her father was sick. Ms. Lowe-Brooks referred Plaintiff to Ms. Wanlapa Fuangphon, a senior benefits specialist at WAH, so that she could request Family Medical Leave Act ("FMLA") leave. Plaintiff decided to apply for FMLA leave and met with Ms. Fuangphon. On November 20, 2010, Plaintiff completed an FMLA certification form for leave connected to a family member's serious health condition. She stated that her care was to "be there for him morally, physical needs. Arrange for long term care for my dad. Leave needed is about 6 weeks." (ECF No. 28-8, at 2). The remainder of the form was completed by a physician in Ghana, who stated that Plaintiff's father has had his condition since August 2007 and estimated the dates of incapacity to run from "19/11/2010 to 30/10/2010 [sic]." (*Id.* at 4). According to Ms. Lowe-Brooks, Plaintiff presented her with a leave form and stated that Ms. Fuangphon had approved her for leave from December 14, 2010 to January 25, 2011. Ms. Lowe-Brooks wrote those dates on the form and gave it to Plaintiff to

deliver to Ms. Fuangphon.   Ms. Lowe-Brooks expected Plaintiff back at work on January 26.   Plaintiff states in her interrogatory answers, however, that "Ms. Lowe-Brooks and Ms. Fuangphon both verbally approved that I could take leave from 12/14/10 through 1/30/2011."  (ECF No. 28-14, at 9).   Plaintiff had previously bought plane tickets from Washington, D.C. to Ghana.   Plaintiff states that she did not purchase the tickets herself.   She states that she intended to depart Washington, DC on December 12, 2010 and leave Ghana on January 26, 2011.   She would then spend a few days recuperating before returning to work on February 1, 2011.   Ms. Fuangphon testified that she examined Plaintiff's medical certification and found that if she desired to take twelve weeks off, she would be qualified to do so because Plaintiff's father's condition was chronic and lifelong.  (ECF No. 34-2, at 5, Trans. 50:10-14).   She did not state what she told Plaintiff specifically in terms of how long she could take off, but testified that she always tells the employee that they are entitled to up to twelve weeks.  (*Id.* at 7, Trans. 52:18-19).   When an employee is traveling out of the country, she always tells them to keep her informed of changed circumstances so she can give them further instructions on what to do.

On December 12, 2010, Plaintiff arrived at Dulles Airport and printed her plane tickets.   It was then that she realized

for the first time that her date of departure from Ghana was scheduled for January 30, 2011, not January 25, 2011 as she had intended.

Plaintiff's leave was officially approved in a letter dated December 20, 2010 from Ms. Fuangphon.  The leave period was stated as between December 14, 2010 and January 25, 2011.  (ECF No. 28-10).  The letter was sent via mail and received by Plaintiff's husband.  He opened the letter and, in early to mid-January 2011, informed Plaintiff of the end date of January 25, 2011.  On January 15, 2011, Plaintiff telephoned Ms. Fuangphon and told her she needed an extension of her FMLA leave. According to Plaintiff, she was told to speak with Ms. Lowe-Brooks.  Plaintiff then called Ms. Lowe-Brooks and stated that she wished to extend her leave to January 30, as she originally requested.  Ms. Lowe-Brooks told Plaintiff that she was due back at work on January 18, 2011.  She subsequently spoke with Ms. Fuangphon, who corrected her that Plaintiff was not due back until January 26, 2011.  A few days later, Plaintiff and Ms. Lowe-Brooks spoke again, and Plaintiff was told that she was due back at work on January 26, not January 18.

The parties disagree as to the reasons Plaintiff gave when requesting a leave extension.  Defendant cites to the testimony of Ms. Lowe-Brooks, who stated that the only reason given by Plaintiff for an extension was that there had been an error in

4

her return flight date.  Plaintiff, by contrast, testified that she needed leave beyond January 25 because her father was still sick and she needed to spend more time with him.  It had nothing to do with the fact that she had already purchased airline tickets with a later date to return.  (ECF No. 28-7, at 14, Trans. 139:8-14).  She wanted to spend more time with him because it could be the last time she would ever see him.  She stated that she would have stayed with him longer, but Ms. Lowe-Brooks insisted that she come back on January 26.  She would have been happy to take the entire twelve weeks she was entitled to under the FMLA.

On January 23, Plaintiff sent Ms. Lowe-Brooks an email that she was attempting to fly standby.  Plaintiff went to the airport in Ghana on January 23 and 24 in an attempt to get a seat as a standby passenger.  She was unsuccessful.  She called her airline and was informed that she would not be able to leave before her scheduled departure on January 30.  Plaintiff testified that for the period between January 25 and January 30, she took care of her father in the same way she had before.  She has a sister who lived in Ghana who was helping take care of their father.  Plaintiff testified that if she were to leave on one of the standby flights, there were family members lined up to care for their father.  (ECF No. 28-7, at 49, Trans. 239:7-21).  Later in her deposition, Plaintiff testified that her

sister was supposed to take care of her father when Plaintiff left on January 26, but she could not, and that's why she asked for a leave extension.   According to Plaintiff, her sister couldn't care for her father because she lives some distance away from her father and had to care for her son.   She learned of her sister's predicament around January 15.   Ms. Lowe-Brooks testified that she never received any indication from Ms. Fuangphon that Plaintiff had requested an extension of her FMLA leave.   She acknowledged that Plaintiff is entitled to an extension of FMLA leave, but that request would have to go through Human Resources.   Ms. Lowe-Brooks never told Plaintiff to contact Human Resources because, based on her discussions with Plaintiff, her request had nothing to do with FMLA, but was solely related to the fact that her airline ticket had an unintended return date.

Plaintiff took her scheduled flight on January 30 and returned to Washington, D.C. the next day.   That night, she left a voice mail with Ms. Lowe-Brooks stating that she was too tired to report to work as scheduled the next day, February 1.   On February 1, Ms. Lowe-Brooks called Plaintiff and told her that she was expected at work.   Plaintiff came to work, clocking in at 1:11 pm, over six hours after her 7:00 am start time.   On February 8, 2011, Defendant issued a "final written warning" to Plaintiff and suspended her without pay for one day based on (1)

6

her failure to report to work on her scheduled dates beginning January 26, ending when she returned to work on February 1; (2) her failure to report her absences; and (3) her failure to report as scheduled on February 1.  The report stated that Plaintiff "will also understand that any further breaches in attendance will result in immediate termination."  ("Final Warning").  Plaintiff signed the form, and stated that she "agree[d] somewhat."  (ECF No. 28-13).

On August 22, 2012, Plaintiff submitted a request to take off September 4-6 in order to accompany her daughter to the start of kindergarten.  On August 30, Ms. Lowe-Brooks granted her request as to September 5 and 6, but denied it as to the 4th. The reason for the denial was that Plaintiff was one of only two echocardiogram technicians scheduled to work on the 4th, and the department could not go down to just one technician for safety reasons.  Consequently, a replacement needed to be found before Plaintiff could take off the 4th.  Ms. Lowe-Brooks told Plaintiff that she had contacted Gary Chin to see if he could work in her place.  The next day, Ms. Lowe-Brooks told Plaintiff that Mr. Chin could not do it and she should find someone else to do it. Plaintiff stated that she first asked Robbie Li to substitute but he was busy.  She called Shin Kim and left messages, but never heard back.  She spoke with Janet Williams who agreed to fill in for Plaintiff, but asked that she call Ms. Kim again to

see whether she was available.   Plaintiff could not reach Ms. Kim, so she called Ms. Williams back and left a message. Plaintiff attempted to reach Ms. Williams on her cell phone but could not reach her.   On September 4, Plaintiff called Ms. Williams's work phone, and was told by a secretary that Ms. Williams was working on the floor.  (ECF No. 28-14, at 10-11). Defendant's policy was to have both the employee and her substitute call their supervisor to inform the supervisor of the substitution.   Plaintiff knew this was the policy.  (ECF No. 28-7, at 39, Trans. 195:1-3).  Plaintiff stated that she called Ms. Lowe-Brooks to inform her that Ms. Williams would be covering her shift.   She was not aware of whether Ms. Williams did the same and learned for the first time during her deposition that Ms. Williams did not show up for work on September 4.   Ms. Williams stated that she spoke with Plaintiff but at the time of the conversation, she was on vacation and was unsure whether she would be able to work on the 4th.   She suggested to Plaintiff that she call Ms. Kim and that Plaintiff should call her back if she could not reach Ms. Kim.   Ms. Williams states that she never told Plaintiff she would cover her shift and, because of that, never called Ms. Lowe-Brooks.  (ECF No. 35-3).  Ms. Lowe-Brooks stated that she never received any notice from Plaintiff as to whether she would be working her September 4 shift or if she had found a replacement.   Ms. Lowe-Brooks attempted to contact

Plaintiff but reached only her voicemail. She reached Ms. Williams who expressed surprise that Plaintiff was not at work. Ultimately, Ms. Williams came in to work.

In a letter dated September 12, 2012, Plaintiff's employment was terminated. The letter stated that Plaintiff's September 4 absence was unauthorized and she did not find someone to cover her shift. "Based on a prior Final Warning for unauthorized leave, [Ms. Lowe-Brooks] has terminated your employment." (ECF No. 28-16).

On January 14, 2013, Plaintiff filed a complaint in this court. Her amended complaint makes four claims: (1) the denial of Plaintiff's extension of FMLA leave interfered with Plaintiff's FMLA rights; (2) the one-day suspension without pay was retaliation for Plaintiff's exercise of, or attempt to exercise, her FMLA rights; (3) Plaintiff's termination of employment was retaliation for taking or attempting to take FMLA leave; and (4) Plaintiff's discharge was discrimination on the basis of family responsibilities, in violation of the Montgomery County Human Rights Act, Montgomery Cnty. Code § 27-19. (ECF No. 17). On February 12, 2014, Defendant filed a motion for summary judgment on all claims. (ECF No. 28). On March 11, 2014, Plaintiff filed an opposition, in which she withdrew her claim based on the Montgomery County Code, leaving only the FMLA

claims.  (ECF No. 34, at 3 n.1).  Defendant replied on March 28, 2014.  (ECF No. 35).

## II.  Standard of Review

A motion for summary judgment will be granted only if there exists no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.  *See* Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  The moving party bears the burden of showing that there is no genuine dispute as to any material fact.  No genuine dispute of material fact exists, however, if the nonmoving party fails to make a sufficient showing on an essential element of his or her case as to which he or she would have the burden of proof.  *Celotex*, 477 U.S. at 322–23.  Therefore, on those issues on which the nonmoving party has the burden of proof, it is his or her responsibility to confront the summary judgment motion with an affidavit or other similar evidence showing that there is a genuine dispute for trial.

In *Anderson v. Liberty Lobby, Inc.*, the Supreme Court of the United States explained that, in considering a motion for summary judgment, the "judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  477 U.S. at 249 (1986).  A dispute about a material fact is genuine "if

the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.  Thus, "the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Id.* at 252.

In undertaking this inquiry, a court must view the facts and the reasonable inferences drawn therefrom "in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (*quoting United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)); *see also E.E.O.C. v. Navy Fed. Credit Union*, 424 F.3d 397, 405 (4th Cir. 2005).  The mere existence of a "scintilla" of evidence in support of the non-moving party's case is not sufficient to preclude an order granting summary judgment.  *See Anderson*, 477 U.S. at 252.

A "party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences." *Shin v. Shalala*, 166 F.Supp.2d 373, 375 (D.Md. 2001) (citation omitted).  Indeed, this court has an affirmative obligation to prevent factually unsupported claims and defenses from going to trial.  *See Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993) (*quoting Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987)).

### III. Analysis

The FMLA provides that an eligible employee must be allowed to take up to twelve work weeks of unpaid leave during any twelve-month period "in order to care for the . . . parent of the employee, if such . . . parent has a serious health condition."  29 U.S.C. § 2612(a)(1)(C).[2]  Two types of claims exist under the FMLA: (1) "interference," in which the employee alleges that an employer denied or interfered with her substantive rights under the FMLA, and (2) "retaliation," in which the employee alleges that the employer discriminated against her for exercising her FMLA rights.  *See Dotson v. Pfizer, Inc.*, 558 F.3d 284, 294-95 (4th Cir. 2009).  "A retaliation claim under the FMLA differs from an interference claim under the FMLA in that the interference claim merely requires proof that the employer denied the employee his entitlements under the FMLA, while the retaliation claim requires proof of retaliatory intent."  *Bosse v. Balt. Cnty.*, 692 F.Supp.2d 574, 588 (D.Md. 2010).  Plaintiff's complaint invokes both types of claims.

---

[2] An "eligible employee" is one who has been employed for more than twelve months before requesting leave under the FMLA, and has worked at least 1,250 hours within that period.  29 U.S.C. § 2611(2)(A).  There is no dispute that Plaintiff was an "eligible employee."

**A.   Count I: Interference**

Plaintiff claims that she had five weeks of FMLA remaining when Plaintiff made her request for an FMLA leave extension in January 2011 and, therefore, the denial of this request constituted interference with Plaintiff's FMLA rights.

> To establish unlawful interference with an entitlement to FMLA benefits, an employee must prove that: (1) she was an eligible employee; (2) her employer was covered by the statute; (3) she was entitled to leave under the FMLA; (4) she gave her employer adequate notice of her intention to take leave; and (5) the employer denied her FMLA benefits to which she was entitled.

*Wonasue v. Univ. of Md. Alumni Ass'n*, 984 F.Supp.2d 480, 495 (D.Md. 2013) (*quoting Rodriguez v. Smithfield Packing Co.*, 545 F.Supp.2d 508, 515 (D.Md. 2008)).  The employee also must prove "that the violation prejudiced her in some way."  *Anderson v. Discovery Commc'ns, LLC*, 517 F.App'x 190, 197 (4th Cir. 2013) (*citing Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89 (2002); 29 U.S.C. § 2617(a)).

> Such prejudice can be proven by showing that the employee lost compensation or benefits "by reason of the violation," 29 U.S.C. § 2617(a)(1)(A)(i)(I); sustains other monetary losses "as a direct result of the violation," *id.* § 2617(a)(1)(A)i)(II); or suffers some loss in employment status remediable through "appropriate" equitable relief, such as employment, reinstatement, or promotion, *id.* § 2617(a)(1)(B).

*Anderson*, 517 F.App'x at 198.

Defendant argues that Plaintiff's interference claim should be summarily dismissed because she failed to allege that she suffered any prejudice as a result of the January 2011 denial of her request for an extension of FMLA leave. Ultimately, Plaintiff received all the time off she requested because she returned to work on February 1, 2011 and remained employed for another nineteen months. Defendant contends that Plaintiff did not allege that her suspension and subsequent termination were acts of interference. Those allegations are only included in Counts II and III regarding retaliation and, in any event, to the extent they are included in her interference claim, they are duplicative of the retaliation claims and should be dismissed.

Plaintiff, in opposition, contends that her interference claim specifically incorporates by reference all of the allegations previously asserted in the complaint, (ECF No. 17-1 ¶ 33), and specifically points to paragraphs twenty through twenty-five and twenty-nine through thirty of the amended complaint. Those paragraphs allege that Plaintiff contacted Defendant to request an extension of leave to her original request date and that she would have had to expend additional money to change her flight should she succeed in traveling standby. Plaintiff went to the airport on January 24-26 in an attempt to get an earlier flight but to no avail. Defendant charged Plaintiff with missing work without an excuse and

suspended her for a day without pay and gave her a final warning.   These paragraphs also allege that Plaintiff was terminated based on the warning rendered in the FMLA leave case and that "[t]he acts of things done or not done by Defendant leading up to and including the termination of Plaintiff improperly interfered with, restrained, or denied the Plaintiff's exercise of, or the attempt to exercise, her FMLA rights and/or retaliating against the Plaintiff for having attempted to exercise her FMLA rights in violation of the [FMLA]."   (ECF No. 17-1 ¶ 30).   According to Plaintiff, "[t]hese paragraphs . . . document the suspension, mistreatment and termination of [Plaintiff] and are incorporated into Count One." (ECF No. 34, at 23).

Plaintiff has stated a claim for interference and created a genuine dispute of material fact on this claim.   The distinction between an interference claim and a retaliation claim under the FMLA is not always clear.   The Fourth Circuit has distinguished between the "prescriptive" and "proscriptive" provisions of the FMLA.   "Prescriptive" rights set a floor for conduct by employers and create entitlements for employees.   *Yashenko v. Harrah's NC Casino Co.*, 446 F.3d 541, 546 (4th Cir. 2006).   For example, the FMLA entitles employees to twelve weeks of unpaid leave during any twelve-month period for family and health-related matters.   29 U.S.C. § 2612(a)(1).   An interference claim

alleges that the employer violated one of these prescriptive rights. The FMLA also contains proscriptive provisions that protect employees from discrimination or retaliation for exercising their substantive rights under the FMLA. For example, an employer firing an employee because she used FMLA leave to which she was entitled would be a retaliation claim. The distinction was well captured by Judge Elrod of the United States Court of Appeals for the Fifth Circuit: claims that arise from the deprivation of an FMLA entitlement are interference claims and do not require a showing of discriminatory intent, whereas claims that arise from alleged retaliation for an employee's exercise of FMLA rights is a retaliation claim and do require a showing of discriminatory intent. *Cuellar v. Keppel Amfels, L.L.C.*, 731 F.3d 342, 349 (5th Cir. 2013) (Elrod, J., concurring). Here, Counts II and III are appropriately characterized as retaliation claims because Plaintiff is alleging that she was punished for the exercise or attempt to exercise an FMLA right, specifically the suspension and eventual termination stemming from her attempt to extend her FMLA leave. In terms of her interference claim, Plaintiff alleges that Defendant refused to authorize FMLA leave, an act that can constitute interference. *Bosse*, 692 F.Supp.2d at 585 (*quoting* 29 C.F.R. § 825.220(b)). The apparent prejudice suffered was the loss of pay for the one-day suspension and later termination

that stemmed from the Final Warning incurred due to the wrongful denial of leave.   The cases Defendant cites for the view that post-leave discipline is a retaliation claim only involve situations where plaintiff failed to identify any denial by her employer of a benefit to which she was entitled under the FMLA. To the contrary, plaintiffs in those cases received all the FMLA leave requested and were not impeded in their use of FMLA leave. It was only after the plaintiff returned from FMLA leave did her employer question whether she fraudulently used her FMLA leave and fired her.  *See Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 282-83 (6th Cir. 2012).   The Fourth Circuit has never expressly held that termination can be brought as an interference claim, but notably when examining a district court decision granting summary judgment on such a claim, it made no indication that the claim was not viable under the interference theory.  *Mercer v. Arc of Prince George's Cnty., Inc.*, 532 F.App'x 392, 396-98 (4th Cir. 2013); *see also Yashenko*, 446 F.3d at 550-51 (denying an employee's FMLA interference claim at the summary judgment stage because the facts clearly showed the employee would have been terminated for reasons unrelated to his FMLA request); *Wysong v. Dow Chem. Co.*, 503 F.3d 441, 447 (6th Cir. 2007) ("If an employer takes an employment action based, in whole or in part, on the fact that the employee took FMLA-protected leave, the employer has denied the employee a benefit

17

to which he is entitled."); *Xin Liu v. Amway Corp.*, 347 F.3d 1125, 1136 (9th Cir. 2003) ("the statutory and regulatory language of [the] FMLA makes clear that where an employee is subjected to negative consequences simply because he has used FMLA leave, the employer has interfered with the employee's FMLA rights."); *Bosse*, 692 F.Supp.2d at 585 ("Actions that constitute 'interfering with' an employee's FMLA rights include . . . 'us[ing] the taking of FMLA leave as a negative factor in employment actions, such as hiring promotions or disciplinary actions." (*quoting Glunt v. GES Exposition Servs., Inc.*, 123 F.Supp.2d 847, 870 (D.Md. 2000); 29 C.F.R. § 825.220(c))); *Ahmed v. Salvation Army*, No. CCB 12-707, 2012 WL 6761596, at *5-6 (D.Md. Dec. 28, 2012) (accepting plaintiff's characterization of her termination claim under the interference rubric).[3]   The factual situation here is unique in that the same act lends itself to both interference and retaliation claims.   Assuming that Plaintiff was entitled to take FMLA leave, denial of that leave is wrongful and constitutes interference.   That interference took the form of the one-day suspension and

---

[3] Defendant's suggestion that the interference claim be dismissed for being duplicative of the retaliation claim is unpersuasive.   The case cited by Defendant, *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 312 n.25 (3[d] Cir. 2012), did not so hold because the issue was not raised on appeal; instead, the court merely mused that dismissal may be appropriate.   Furthermore, the cases it cites either involve situations not analogous to this case or have taken a narrower view of what can constitute an interference claim.

termination.    Unlike  a  retaliation  claim,  which  focuses  on whether  the  plaintiff  was  treated  *differently*  on  account  of something  (race,  religion,  FMLA  leave)  that  a  statute  makes irrelevant,  an  interference  claim  alleges  that  the  employer failed  to  provide  a  substantive  right,  regardless  of  the  fact  of whether  other  employees  were  treated  more  or  less  favorably. But  the  alleged  facts  also  lend  themselves  to  an  FMLA retaliation  claim,  whereby  Plaintiff  argues  that  the  discipline handed  down  to  Plaintiff  was  harsher  than  other  employees  in  her situation  would  have  received  *because*  she  invoked  her  right  to take  FMLA  leave,  *i.e.*,  an  employee  who  is  punished  with  a  two-day  suspension  for  missing  four  days  of  work  unexcused  on alleged  FMLA  leave  as  opposed  to  an  employee  who  misses  four days  of  work  unexcused  for  a  non-FMLA  reason  is  suspended  only one-day.    Plaintiff  can  claim  interference  with  her  FMLA  rights in  the  form  of  the  suspension  and  termination.

Defendant  next  turns  to  the  elements  of  the  interference claim  and  argues  that  Plaintiff  failed  to  provide  adequate notice  that  she  needed  an  extension  for  FMLA-covered  purposes. Defendant  asserts  that  Plaintiff  did  not  seek  an  extension  of leave  "in  order  to  care  for"  for  her  ailing  father,  but  instead because  her  travel  itinerary  was  not  what  she  thought  she  had purchased  and  her  return  flight  would  not  arrive  before  the  end of  her  FMLA-approved  leave.    The  regulations  state:

> It may be necessary for an employee to take more leave than originally anticipated. . . . [T]he employer may require that the employee provide the employer reasonable notice (*i.e.*, within two business days) of the changed circumstances where foreseeable.   The employer may also obtain information on such changed circumstances through requested status reports.

29 C.F.R. § 825.311(c).  Defendant does not argue that Plaintiff failed to give a timely notice or to make contact, but instead that Plaintiff gave no indication that her reason for a leave extension was FMLA-related.   Plaintiff, in response, contends that she spoke to both Ms. Fuangphon and Ms. Lowe-Brooks and to each requested an extension of leave to care for her father. Plaintiff's deposition testimony, where she states that she requested a leave extension to care for her father, creates a factual dispute as to whether Plaintiff's request was in fact "in order to care for" her father who she asserts, and the medical certificate suggests, had a "serious health condition." Although a jury may find otherwise, Plaintiff has created a triable issue as to this element.

Defendant further argues that even assuming that Plaintiff told Ms. Lowe-Brooks that she needed more time to care for her father, she failed to place Defendant on notice because she "did not claim that her father's medical condition had worsened, that other caregivers had unexpectedly become unavailable, or that there had been any other *unforeseen* development that justified

additional FMLA-covered leave with less than thirty-days'
advance notice." (ECF No. 28-1, at 21) (emphasis in original).
Defendant is referring to 29 C.F.R. §§ 825.302 and 303, which
require an employee to provide at least thirty days advance
notice when the need for leave is foreseeable, 29 C.F.R. §
825.302(a), but as soon as practicable when the approximate
timing of the need for leave is not foreseeable, *id.* §
825.303(a). Defendant argues that because Plaintiff made no
indication that there was an unforeseen development in her
father's condition or the circumstances surrounding his care,
she was not entitled to an extension of *unforeseen leave*.

Defendant's argument will be rejected. It points to no
authority stating that an extension of previously approved leave
requires a material change in circumstances. The FMLA provides
that an employee is eligible for leave to care for a parent with
a serious health condition. 29 U.S.C. § 2612(a)(1)(C). There
is no discussion that the health condition must become more
serious for the employee to get an extension of that leave. If
the situation qualifies for leave under the FMLA, leave is to be
granted, regardless of the fact that this is an extension of a
previously granted period of leave. If Defendant thought that
Plaintiff's father no longer needed care, it could ask for a
certification to confirm that the serious health condition that
requires care still exists. 29 C.F.R. § 825.308(c).

Defendant next argues that Plaintiff did not actually need to stay in Ghana because she "needed to care" for her ailing father, but instead because of a completely unrelated ticketing error.  Plaintiff testified that her plan all along was to leave January 25, which would allow sufficient time to rest in order to return to work February 1.  Thus, by her own admission, she was only "needed" to care for her father through January 25, 2011, which was confirmed by her leave request, which indicated she needed "about six weeks of leave."  The six week period ended on January 25, 2011.  Plaintiff testified that nothing changed about her father's condition and, if anything, it improved slightly.  Furthermore, Plaintiff's call to Ms. Lowe-Brooks came only after her efforts to change her flight came up short, not because of her need to care for her father.  Plaintiff testified that she needed to stay to care for her father because her sister, who was scheduled to care for him, became unavailable because "she has a little son."  Defendant states that this is implausible given that this development apparently occurred on January 15, the exact date Plaintiff called Ms. Lowe-Brooks to request an extension and Plaintiff never informed Defendant of this apparent situation at the time of the request.  Furthermore, Defendant contends that Plaintiff's testimony has been so inconsistent as to be unreliable.  At one point, she testifies that she requested an

22

extension because she was unable to change her flight; at another time she states that she was forced to stay in Ghana because her sister was unavailable; and at other times she states that she wanted to spend more time with her father. Defendant believes that while Plaintiff may have provided care for her father, any care was an incidental consequence of the ticketing mistake, not the reason for her need for an extension.

This argument will be rejected for a similar reason as above. Plaintiff can get unpaid leave to take care of a parent with a serious health condition. The employer must be told that that is the reason for the leave. The burden to demonstrate both the reason for the leave and that notice was provided falls upon Plaintiff, but given the evidence, there is at least a dispute as to each. If the employer was in fact told and was skeptical of Plaintiff's representations, it does not have to accept its employee's word, but instead can request a certification of the serious health condition. *Ballard v. Chi. Park Dist.*, 741 F.3d 838, 843 (7th Cir. 2014) ("an employer concerned about the risk that employees will abuse the FMLA's leave provisions may of course require that requests be certified by the family member's health care provider." (*citing* 29 U.S.C. § 2613)). The cases cited by Defendant involve situations where the aggrieved employee was taking the leave for personal reasons, not to provide care for a family member with a

serious health condition. *See Pilger v. D.M. Bowman, Inc.*, 833 F.Supp.2d 489, 498 (D.Md. 2011) (plaintiff was absent from work to drive his wife to her mother's home, a trip unrelated to his wife's medical condition or basic needs); *Tayag v. Lahey Clinic Hosp., Inc.*, 677 F.Supp.2d 446, 452 (D.Mass. 2010) (undisputed that nearly half of plaintiff's trip was essentially a vacation, spent visiting friends, family, and local churches); *Call v. Fresenius Med. Care Holdings, Inc.*, 534 F.Supp.2d 184, 192 (D.Mass. 2008).  While the burden is on Plaintiff to show that she was entitled to FMLA leave by demonstrating that she stayed in Ghana to care for her father who had a "serious medical condition," based on her deposition testimony and the doctor's certification, there is a genuine dispute of material fact such that summary judgment on these grounds would be inappropriate.

Defendant's next argument is that Plaintiff was not entitled to this leave under the FMLA because she failed to comply with Defendant's "usual and customary notice and procedural requirements."  29 C.F.R. § 825.303(c).  Defendant points to its corporate policy manual on attendance, which states that "[e]mployees are to call *each day* to notify their supervisor/manager that they are absent unless such an absence has been approved by the supervisor/manager for a specified period of time."  (ECF No. 28-12, at 3 (emphasis added)). According to Defendant, Plaintiff made no effort to contact Ms.

Lowe-Brooks or anyone at AHC between January 23 and January 31, even though she was scheduled to work on January 26 and subsequent days.   Ms. Lowe-Brooks was aware of Plaintiff's efforts to fly standby, but was unaware of the status of these efforts.   Ms. Lowe-Brooks left messages on Plaintiff's mobile and home telephone numbers, but received no response. Consequently, even assuming that Plaintiff was entitled to additional FMLA leave, she forfeited any such entitlement because she failed to comply with Defendant's usual and customary notice procedures.   Plaintiff, in response, contends that she complied with this requirement when she contacted Ms. Fuangphon to request the extension of the FMLA leave.   This dispute turns again on what Plaintiff told Defendant when she requested additional leave.   If, as Plaintiff contends, she told Defendant that she needed an extension of FMLA leave to continue to care for her father, this could be a "scheduled absence" under Defendant's policy as it would be "leave required under the FMLA."   For such leave, the policy does not require daily call-ins.

### B.   Count II: Retaliation in the form of one-day suspension

Plaintiff claims that Defendant's suspension of Plaintiff for one-day without pay was retaliation for exercise or attempt to exercise her FMLA rights.

"FMLA claims arising under the retaliation theory are analogous to those derived under Title VII." *Yashenko*, 446 F.3d at 550-51. Consequently, a plaintiff can prove her case under ordinary principles of proof using either direct or indirect evidence, or under *McDonnell Douglas*'s burden-shifting scheme. As to the first method, "[t]o avoid summary judgment, the plaintiff must produce direct evidence of a stated purpose to discriminate and/or [indirect] evidence of sufficient probative force to reflect a genuine issue of material fact." (second alteration in original). *Rhoads v. FDIC*, 257 F.3d 373, 391 (4th Cir. 2001). "What is required is evidence of conduct or statements that both reflect directly the allegedly discriminatory attitude and that bear directly on the contested employment decision." *Id.* at 391-92. In *Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 520 (4th Cir. 2006), the Fourth Circuit explained the showing that is required to withstand summary judgment *via* ordinary principles of proof:

> Direct evidence must be "evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision." *Taylor v. Virginia Union Univ.*, 193 F.3d 219, 232 (4th Cir. 1999) (en banc) (citation and internal quotation marks omitted). Even if there is a statement that reflects a discriminatory attitude, it must have a nexus with the adverse employment action. *See Brinkley* [*v. Harbour Rec. Club*], 180 F.3d [598,] 608 [4th Cir. 1999)] ("To survive summary judgment on the basis

> of direct and indirect evidence, Brinkley
> must produce evidence that clearly indicates
> a discriminatory attitude at the workplace
> and must illustrate a nexus between that
> negative attitude and the employment
> action.") [*overruled on other grounds by
> Desert Palace, Inc. v. Costa*, 539 U.S. 90
> (2003)].

Alternatively, a plaintiff can proceed by proving her case circumstantially using the pretext framework established in *McDonnell Douglas*. To succeed under this method, the employee

> must first make a prima facie showing "that
> [s]he engaged in protected activity, that
> the employer took adverse action against
> [her], and that the adverse action was
> causally connected to the plaintiff's
> protected activity." *Cline v. Wal-Mart
> Stores, Inc.*, 144 F.3d 294, 301 (4th Cir.
> 1998). If [s]he "puts forth sufficient
> evidence to establish a prima facie case of
> retaliation" and [the employer] "offers a
> non-discriminatory explanation" for [her]
> termination, [the employee] "bears the
> burden of establishing that the employer's
> proffered explanation is pretext for FMLA
> retaliation." *Nichols* [*v. Ashland Hosp.
> Corp.*], 251 F.3d [496,] 502 [(4th Cir.
> 2001)].

*Yashenko*, 446 F.3d at 551. Defendant argues on the assumption that Plaintiff is proceeding under the burden shifting framework and assumes that Plaintiff has satisfied the first two prongs of the *prima facie* case: that she engaged in protected activity by requesting an extension of FMLA leave, and that her one-day suspension without pay constituted an adverse employment action. Defendant argues, however, that Plaintiff cannot establish that

27

the adverse employment action was causally connected to the protected activity. (ECF No. 28-1, at 28). It contends that Plaintiff was disciplined for three reasons: (1) failure to report to work as scheduled on January 25; (2) failure to contact Defendant after January 23 to report on her status; and (3) her conduct on February 1, when she arrived to work six hours late, and only after being instructed to do so by Ms. Lowe-Brooks. Defendant contends that because Plaintiff was not entitled to an extension of FMLA leave, however, her absences were not protected and Defendant had every right to subject Plaintiff to disciplinary action for failure to report to work as scheduled and failure to inform Ms. Lowe-Brooks of her status.

The crux of Defendant's arguments - while framed as Plaintiff's failure to demonstrate causation - are in reality an assertion that Plaintiff has failed to demonstrate that she engaged in protected activity. To demonstrate that an employee engaged in protected activity, she must demonstrate that: (1) she was an eligible employee; (2) her employer was covered by the statute; (3) she was entitled to leave under the FMLA; and (4) she gave her employer adequate notice of her intention to take leave. *Rodriguez v. Smithfield Packing Co.*, 545 F.Supp.2d 508, 516 (D.Md. 2008) (*citing Edgar v. JAC Prods., Inc.*, 443 F.3d 501, 507 (6th Cir. 2006)). Defendant - for the purposes of

this motion - assumes the fourth prong, but takes issue with the third prong.  As discussed above, whether Plaintiff was entitled to FMLA leave is a disputed issue and, consequently, it is not appropriate to grant summary judgment to Defendant on the retaliation claim concerning her one-day suspension.

### C.   Count III: Retaliation in the form of termination of employment

Plaintiff is not clear as to her intentions, but in opposing Defendant's summary judgment motion appears to be relying on the direct evidence method of proof given the large amount of emphasis she places on the language of the termination letter.  Defendant argues that, even assuming Plaintiff engaged in protected activity, her termination was not causally connected to that protected activity.  Defendant argues that, under the FMLA, Plaintiff must establish that her protected activity was the "but-for" cause of her termination, not just a motivating factor.  It relies on the recent decision in *Univ. of Texas S.W. Med. Ctr. v. Nassar*, 133 S.Ct. 2517, 2533 (2013), where the Supreme Court held that "Title VII retaliation claims must be proved according to traditional principles of but-for causation, not the lessened causation test ['motivating factor'] stated in 42 U.S.C. § 2000e-2(m)."  But-for causation "means that the employer would not have taken the adverse employment action against [the plaintiff] if the employer were not trying

to retaliate against the plaintiff for engaging in a protected activity." *Mallik v. Sebelius*, 964 F.Supp.2d 531, 550 (D.Md. 2013) (*citing Nassar*, 133 S.Ct. at 2533).

The parties did not engage the issue, but the question of whether a mixed-motive claim survives in the FMLA context after *Nassar* is unsettled. *See Hughes v. B/E Aerospace, Inc.*, No. 1:12CV717, 2014 WL 906220, at *8 (M.D.N.C. Mar. 7, 2014) ("The Fourth Circuit has not determined whether plaintiffs in FMLA retaliation cases must prove but-for causation to prevail, or whether retaliation must be only a motivating factor in the employer's termination decision.") Some courts - including one in this district - have decided that post-*Nassar*, the "but for" causation standard applies to FMLA retaliation cases. *See Taylor v. Rite Aid Corp.*, --- F.Supp.2d ----, 2014 WL 320214, at *9 (D.Md. Jan. 27, 2014); *Latta v. U.S. Steel-Edgar Thompson Plant*, No. 2:11-cv-1622, 2013 WL 6252844, at *5 (W.D.Pa. Dec. 4, 2013) ("[p]laintiff must prove traditional 'but-for' causation." (*citing Nassar*)). Others have concluded the opposite. *See Chaney v. Eberspaecher N. Am.*, 955 F.Supp.2d 811, 813 n.1 (E.D.Mich 2013) (*Nassar*, decided under Title VII, did not change the applicable causation standards for FMLA retaliation cases). Judge Bennett has observed that the Supreme Court held in *Nassar* only that the plaintiff must *ultimately* prove that the alleged retaliation was the but-for cause of the adverse employment

30

action, while at the summary judgment stage, a plaintiff "is not required to conclusively establish the causal connection required to ultimately prevail, but rather faces a 'less onerous burden of making a *prima facie* case of causality.'" *Ford v. Berry Plastics Corp.*, No. RDB-12-0977, 2013 WL 5442355, at *10 n.8 (*quoting Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998)).

This question does not need to be decided here as under either standard the evidence presents a genuine dispute of material fact on the causation question.  Defendant first argues that the gap in time between the use of the FMLA leave and the alleged retaliation - more than nineteen months - is too remote to infer causation.  The Fourth Circuit has held that "a causal connection for purposes of demonstrating a *prima facie* case exists where the employer takes adverse employment action against an employee shortly after learning of the protected activity." *Price v. Thompson*, 380 F.3d 209, 213 (4th Cir. 2004). Conversely, a longer passage of time "tends to negate the inference of discrimination." *Id.*  Temporal proximity is, however, just one means by which to show causation.  *See Westmoreland v. Prince George's Cnty., Md.*, 876 F.Supp.2d 594, 613 (D.Md. 2012) ("[P]laintiffs may state a prima facie case of causation by relying on evidence other than, *or in addition to*, temporal proximity where such evidence is probative of

31

causation." (emphasis in original, citation and internal quotation marks omitted)). While a period as long as nineteen months normally negates the inference of discrimination, *see Elries v. Denny's, Inc.*, 179 F.Supp.2d 590, 599 (D.Md. 2002) (listing cases that found three and four month periods insufficient), here the termination letter indicates that Plaintiff's September 4 absence violated Defendant's attendance policy and "[b]ased on a prior Final Warning for unauthorized leave, Adella [Lowe-Brooks] has terminated your employment." (ECF No. 28-16). As a document providing the official reasons for Plaintiff's termination, a reasonable factfinder could conclude that Plaintiff's September 4 absence - even assuming it was wrongful - would not have resulted in termination absent the prior Final Warning. That Final Warning was based on what Defendant claims was an unexcused absence, but what Plaintiff here contends was protected FMLA leave. Defendant argues that the Final Warning advised Plaintiff that her employment would be terminated only for *future* unauthorized absences, not any *past* absences that were arguably protected under the FMLA and there is no evidence that Plaintiff was penalized for her past absences. There is such evidence, however: the termination letter, which specifically references the fact that termination was based on the Final Warning. That Final Warning came to be only because of past absences. Defendant goes on to argue that

the September 4 absence itself warranted termination.  It points
to the declaration of Ms. Lowe-Brooks where she states that she
considered Plaintiff's "failure to report to be gross misconduct
which, by itself, warranted the termination of her employment."
(ECF No. 28-2 ¶ 32).  But in the very next paragraph, she admits
that when she consulted with her superiors concerning
appropriate discipline, "we considered the fact that [Plaintiff]
had been warned in February 2011 that she would be terminated if
she violated AHC's attendance policies." (*Id.* ¶ 33).  Defendant
next makes much of the fact that it is an at-will employer and
its policies permit termination regardless of whether an
employee has been subject to prior disciplinary action.  But
those policies do not override the strictures of the FMLA, which
prohibit an employer from retaliating against an employee for
the employee exercising her FMLA rights, which the termination
letter's language suggests was the case.

Once there is sufficient, credible direct evidence, the
burden of persuasion shifts to the Defendant to show that it
would have terminated Plaintiff's employment had it not been
motivated by Plaintiff's prior FMLA leave. *Taylor v. Virginia
Union Univ.*, 193 F.3d 219, 232 (4th Cir. 1999) (en banc).
Defendant submits that Plaintiff's absence on September 4 was so
egregious that it would have terminated Plaintiff immediately,
even if Plaintiff had no prior history of allegedly unexcused

absences.    Ms.  Lowe-Brooks  testified  that  Plaintiff's  absence
left  only  one  echocardiogram  technician  on  duty,  presenting
great  risk  to  the  health  and  safety  of  WAH's  patients  and
constituting  gross  misconduct,  insubordination,  and  neglect  or
abandonment  of  patients,  each  of  which  constitutes  grounds  for
immediate  termination  under  WAH's  policies.   Mr.  Brent  Lydic  was
the  WAH  employee  with  whom  Ms.  Lowe-Brooks  was  required  to
consult  with  before  terminating  the  employment  of  any  employee.
In  a  declaration  submitted  as  part  of  Defendant's  reply,  he
stated  that  he  agreed  with  Ms.  Lowe-Brooks's  assessment  of  the
seriousness  of  Plaintiff's  conduct  as  to  her  September  4
absence.   He  drafted  the  termination  letter  and  states  that  his
"intention  in  including  this  language  ['based  on  a  prior  Final
Warning  for  unauthorized  leave']  was  to  highlight  the  fact  that
[Plaintiff]  had  been  disciplined  for  attendance  violations  in
the  past."   (ECF  No.  35-2  ¶  6).   These  post-hoc  explanations  are
not  sufficiently  persuasive  that  Plaintiff's  termination  would
have  occurred  absent  the  prior  alleged  FMLA  leave,  at  least  at
the  summary  judgment  stage.   There  is  a  genuine  dispute  as  to
whether  failing  to  show  up  for  work  and,  therefore,  leaving  WAH
with  only  one  echocardiogram  technician  on  duty  -  was  so
egregious  that  it  would  have  resulted  in  immediate  termination.

**IV.  Conclusion**

For the foregoing reasons, the motion for summary judgment filed by Defendant will be denied.  A separate order will follow.


                                                                   /s/
                                                DEBORAH K. CHASANOW
                                                United States District Judge